857 So.2d 1012 (2003)
Bonnie D. REED
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY.
No. 2003-C-0107.
Supreme Court of Louisiana.
October 21, 2003.
*1013 Katherine P. Martin, Gretchen H. Marard, Counsel for Applicant.
Anne E. Watson, Dupre & Watson, Sunset, Counsel for Respondent.
WEIMER, Justice.
We granted a writ in this matter to review the lower courts' award of penalties and attorney fees for the failure of an uninsured motorist insurer to make a timely and reasonable tender of its policy limits following a vehicular accident. See, LSA-R.S. 22:658 and LSA-R.S. 22:1220. Plaintiff filed suit shortly after the insurer made a partial tender; subsequently, the insurer tendered its policy limits prior to trial. Thus, the only issue at trial was whether the insurer was arbitrary, capricious, or without probable cause in initially withholding the policy limits. After review of the information available to the insurer at the time of its partial tender, we reverse.

FACTS
Essential to the resolution of this case is a chronological consideration of the facts as revealed in the trial testimony and documentary evidence. Events which preceded *1014 the vehicular accident that gave rise to the claim sued upon had a significant impact on what transpired after the vehicular accident, particularly on the insurer's assessment of the plaintiff's claim.
In June 2000, Bonnie D. Reed stepped in a hole in her yard and incurred an injury to her right knee. Her family physician, Dr. Chuck Aswell, III, referred her to Dr. Barry J. Henry, an orthopaedic surgeon. At an August 31, 2000 visit to Dr. Henry, Reed reported having chronic ankle instability problems for many years, but not many problems with her right knee prior to the at-home accident. Dr. Henry diagnosed a degenerative joint disease with acute meniscus tear. He recommended physical therapy for the knee and ankles, continuation of medication prescribed by Dr. Aswell, and a follow-up visit in four weeks if the pain continued. He noted: "We will consider knee arthroscopy for debridement of the medial meniscus tear. The [50-year-old] patient understands that she has some beginnings of moderate arthritis in the right knee at this point and may eventually need a total knee replacement as she ages." (Underlining supplied.)
On October 13, 2000, Dr. Henry performed arthroscopic surgery on Reed's right knee. Despite a serious reaction to medication administered during the surgery, Reed recuperated well and Dr. Henry found her to be "quite stable" following the arthroscopic surgery. Reed was scheduled for a return visit to Dr. Henry in early March of 2001.
Before the return visit to Dr. Henry, Reed was involved in a vehicular accident on February 27, 2001, when Mary Fontenot ran a red light and struck the Reed vehicle. Reed was able to drive away from the accident. The fact that Fontenot was 100 percent at fault was not contested. Both drivers were insured by State Farm Mutual Automobile Insurance Company (State Farm). Because Reed's claims involved separate policies, State Farm followed its usual practice and assigned the claims to separate claim specialists.[1]
Shortly after the vehicular accident State Farm assigned claim specialist Cedric Roy to handle Reed's claim for damages pursuant to its automobile liability policy issued to Fontenot. Later, on June 22, 2001, Reed asserted a UM claim by calling Shawn Smith, the first claim specialist assigned to the UM file, and telling him she needed a knee replacement as a result of the accident. She did not mention to any State Farm claim specialist the facts that she had injured the same knee in an at-home accident a year before, that she had had arthroscopic surgery as a result of the at-home accident, and that prior to the vehicular accident Dr. Henry had counseled her about eventually needing total knee replacement.
Smith forwarded a medical authorization form to Reed, asking her to execute and return the form to him. He also contacted Roy about the liability file, and Roy informed him that at that time Reed had a four-month injury which did not exceed the $10,000.00 liability policy limits.[2]
*1015 On June 27, 2001, when Reed's executed medical authorization was received by State Farm, Monica Domingue was the claim specialist assigned to handle the UM coverage claim. Her initial action was to forward the medical authorization to Roy to obtain all records in the State Farm liability file. On July 5, 2001, Domingue received medical bills totaling $3,273.32 and records reflecting treatment through May 21, 2001, less than three months post accident.
Other details revealed in the medical records at that time were pertinent to Domingue's handling of the claim. Reed had consulted the same orthopedist with whom she was still treating, Dr. Henry, two days after the vehicular accident, stating complaints of various aches and pains. The office visit report states Reed was concerned about her knees since she had previously undergone right knee arthroscopy on October 13, 2000. Having previously performed the right knee arthroscopy, Dr. Henry noted that although the knee showed moderate degenerative changes, Reed had been "quite stable" in her knees following the surgery and prior to the 2001 vehicular accident. With radiological examination of the knees showing no objective findings, Dr. Henry's assessment at the first examination following the vehicular accident was "lumbo sacral strain... with acute flare bilateral knee arthritis." He recommended Reed have physical therapy once a week for four weeks for mobilization stretching of the back and lower extremities and massage therapy. He instructed Reed to return in one month.
As instructed, Reed returned to Dr. Henry approximately a month later, on March 30, 2001, stating she had been unable to complete the physical therapy because of family illness. She voiced complaints of right knee swelling and more pain. Dr. Henry's examination revealed moderate effusion of the right knee with pain around the patella and with flexion. An injection was administered to relieve the condition. The doctor's recommendation was a continuation of physical therapy and a follow-up visit in three months.
Reed did not wait three months, but returned to Dr. Henry on May 3, 2001. The office visit report of that date was the first mention after the vehicular accident of a total knee replacement. He stated: "The patient was doing quite well up until a car accident and patient has increased pain and swelling when she had been down to hardly any pain.... [W]e have tried physical therapy without much relief.... I recommend Synvisc injections to try to resolve the inflammation.... Hopefully we can do Synvisc injections to avoid early total knee arthroplasty." (Underlining supplied.) According to two more reports in May, the injections were affording Reed some relief.
Reed's next visit with Dr. Henry was June 21, 2001, at which time he ordered a bone scan to examine the area of pain she had been experiencing since the vehicular accident. Dr. Henry's report is specific about his discussion with Reed, as follows:
The patient reports that her RIGHT knee pain has been constant.... Most of her pain is around the front of the knee ... and it feels like a burning kind of pain on the medial aspect of the RIGHT knee at the area of her chondromalacia noted at arthroscopy.... At this point she is 51 years of age and we both realize that she will probably require total knee arthroplasty in the future.

*1016 We have a long discussion about the benefits of total knee arthroplasty and the problems encountered with early wear implanted [sic] in young patients; however the patient also understands with modified activities we can increase the life of the prosthesis and we will keep this in mind in the next few years when we are discussing total knee arthroplasty. (Underlining supplied.)
The day after Dr. Henry included in his report that he talked to Reed about total knee arthroplasty "in the next few years," Reed called State Farm to assert a UM claim on the basis of needing a total knee replacement because of the accident. State Farm did not receive Dr. Henry's June 21, 2001 report until July 16, 2001.
As noted above, the record of Reed's March 1, 2001 visit to Dr. Henry two days after the vehicular accident made reference to the fact she had had right knee surgery before the vehicular accident, specifically, she had "undergone RIGHT knee arthroscopy with medial and lateral partial menisectomy with chrondroplasty on 10/13/00." This fact, which Reed had not revealed in her communications with State Farm, raised a causation question in Domingue's mind. She sent Reed's authorization to her treating physicians, Dr. Henry and Dr. Aswell, in an effort to procure the records of the medical treatment Reed received prior to the vehicular accident for the purpose of investigating the apparent pre-existing condition of the right knee.
Reserving her rights against State Farm as her own UM insurer, with UM limits of $25,000.00, Reed settled with State Farm for the $10,000.00 liability policy limits on July 23, 2001.
A week later State Farm received the requested records of Dr. Henry's treatment of Reed prior to the vehicular accident. In addition to giving details of the right knee arthroscopy on October 13, 2000, these records revealed Dr. Henry made the following prognosis at Reed's August 31, 2000 visit: "The patient understands that she has some beginnings of moderate arthritis in the right knee at this point and may eventually need a total knee replacement as she ages." (Underlining supplied.) This mention of the possible need for a total knee replacement predated the vehicular accident by six months.
Thus, Dr. Henry's prognosis for Reed that included total knee replacement was similar before and after the vehicular accident. Before the vehicular accident, he stated Reed "may eventually need a total knee replacement as she ages"; following the vehicular accident, he stated that "she will probably require total knee arthroplasty in the future[,] ... in the next few years."
It was not until July 30, 2001, that State Farm received the report of Reed's visit with Dr. Henry on July 5, 2001, the purpose of which was a discussion of her bone scan. In his report the doctor noted her problem with her right knee was consistent with degenerative arthritis. She was given a prescription and told to return in three months. This office visit report contained no mention of a total knee replacement.
By the end of July 2001, Domingue had in her possession the following documented information. Six months prior to the vehicular accident, Dr. Henry had cautioned Reed that she "may" need total knee replacement as she aged; Dr. Henry had performed right knee arthroscopy four and a half months prior to the vehicular accident, a procedure occasioned by Reed's at-home accident; and following the vehicular accident, Dr. Henry was still predicting Reed would need total knee replacement only "in the next few years."
*1017 Nevertheless, Reed did not inform State Farm of these pertinent facts in making demand on State Farm for payment pursuant to its UM coverage on the basis of her need for total knee replacement. Reed informed State Farm she needed a total knee replacement, but she did not tell State Farm Dr. Henry had told her of this need before the vehicular accident. Thus, Domingue's decision not to make a tender at that time without further investigation was justified.
Domingue drafted a letter to Dr. Henry, dated August 3, 2001, in which she stated Reed "informs me that you have recommended a total knee replacement." The letter continued: "I've read in your records that such procedure was forthcoming prior to the accident. To what extent did the [motor vehicle accident] aggravate her pre existing condition?" Additionally, Domingue wrote to Reed to report that she was still working on her claim; that she had not received Dr. Aswell's response;[3] that she had received Dr. Henry's reports; and that she had written to Dr. Henry inquiring about the aggravation of Reed's degenerative joint disease.
Dr. Henry responded to Domingue's inquiry by letter dated August 28, 2001, which states in pertinent part:
In response to your question "to what extent did the motor vehicle accident... aggravate her pre existing condition?" The motor vehicle accident seems to have aggravated Miss Bonnie Reed's arthritis in her knee such that she has had persistent pain in the knee with giving way and swelling with recurrent effusions in the knee since the time of the accident. The patient was doing quite well with regards to her knee problems since her arthroscopy was performed and chondroplasty of the cartilage flaps and meniscus tears. I do think the patient will require total knee arthroplasty in the future for relief of her pain and this was recommended to her prior to her motor vehicle accident. However the most recent aggravation of her knee during the motor vehicle accident may cause her to have this total knee replacement at an earlier age if she persists with pain that is not relieved by conservative measures.
I do not [know] if this helps answer your question. There was aggravation of her preexisting condition from the motor vehicle accident, which may lead to earlier interventions with total knee arthroplasty in this patient's future. [Underlining supplied.]
Although Dr. Henry had the opportunity in responding to Domingue's inquiry to state the vehicular accident caused the need for total knee replacement, he did not do so; he merely stated the aggravation of her preexisting condition "may" lead to earlier total knee replacement.
An entry in State Farm's "ACTIVITY LOG" on September 5, 2001, by Domingue indicated she received Dr. Henry's response that the vehicular accident aggravated Reed's preexisting condition which "may lead to earlier interventions with a total knee arthroplasty in [the] future.... [S]he is still undergoing conservative treatment and the total knee arthroplasty has not been mentioned for the near future." (Underlining supplied.) Domingue concluded there was a total claim value of $17,500.00 to $18,500.00. She recommended an unconditional tender of $7,500.00 at that time, with instruction to Reed as to the prescriptive date of February 27, 2003, and with an assurance that Domingue would continue to evaluate the *1018 claim if Reed continued to treat. The date of the tender was approximately one month before Reed was to return to Dr. Henry as he had instructed her in July. Domingue noted the $7,500.00 would take care of outstanding medical bills of $2,500.00 and, together with the portion of the liability policy limits not earmarked for medical expenses, would give Reed $2,000.00 per month for general damages for the six months following the accident.
After accepting the partial tender, Reed initiated no further contact with State Farm prior to filing suit on October 3, 2001. The suit alleged State Farm was arbitrary and capricious in failing to tender its UM limits of $25,000.00 and/or a reasonable amount under the policy. Domingue's ACTIVITY LOG entry for October 26, 2001, states that she was served with the suit and that the only other activity in the file since the partial tender had been the submission to State Farm two days earlier of chiropractic bills which were not identified as being related to the vehicular accident.[4]
On the date of service, Domingue left a telephone message for Reed's attorney requesting an extension of time. The attorney returned her call on the next business day. They discussed the information Domingue had in her file concerning Reed's problem with her knee prior to the accident, and Domingue agreed to supply Dr. Henry's reports to the attorney for her review.
Thereafter, on November 2, 2001, Domingue received a letter from Reed's attorney, which states in pertinent part:
It appears that Bonnie [Reed] was doing quite well after her knee problem and the accident has caused her to need surgery sooner. It has also caused her much more pain and physical limitation.
. . . .
[Reed] had a very unfortunate experience approximately one (1) year ago and almost died from a reaction to medicine administered during a [knee] surgery. Therefore, she is not psychologically prepared to undergo another surgery at this time. ... State Farm is responsible for her additional pain and suffering and limitations resulting from the accident, despite her justifiable reluctance to undergo another surgery so soon after her unfortunate experience. [Underlining supplied.]
Shortly thereafter, State Farm turned the matter over to a defense attorney. Interrogatories were propounded to Reed's attorney on November 19, 2001, with a letter stating that once State Farm received Reed's response to discovery, State Farm would schedule Reed's deposition. The interrogatories were not answered until January 16, 2002. In her answers Reed made two assertions: 1) that she had been unable to work since June of 2001 because of the instability and pain in her knee and because of cerebral migraines;[5] and 2) that she needed a knee replacement which she could not afford because State Farm had not tendered its policy limits of $25,000.00. On January 22, *1019 2002, State Farm noticed Reed's deposition for March 1, 2002.
Meanwhile, on January 29, 2002, Reed consulted Dr. Charles L. Johnson, an orthopaedic surgeon. She stated to him that she had misgivings about further surgery because of her past experience, but she could not foresee any other way to be relieved of the knee problem. Dr. Johnson agreed with her that a total knee replacement was her only viable option.
Reed's deposition was rescheduled for February 18, 2002, because her knee surgery had been scheduled for February 25, 2002. After State Farm became aware of Reed's consultation with Dr. Johnson, State Farm requested his records and began the process of scheduling his deposition.
State Farm requested Dr. Johnson's records on February 1, 2002. At his deposition on March 4, 2002, Dr. Johnson testified that the damage to Reed's knee which precipitated the total knee replacement was caused by the vehicular accident. Following this deposition, State Farm tendered the balance of the UM limits, which amounted to $17,500.00. Its check dated April 3, 2002, was for $18,128.87, an amount that included $628.87 for legal interest.
Trial on the merits was held during May of 2002. The trial court rendered judgment in favor of Reed, assessing State Farm with penalties of $1,800.00 plus interest; $15,000.00 in attorney fees, plus interest; costs of the proceeding; and a $350.00 expert witness fee for Timothy Fontenot, the physical therapist. In its reasons for judgment, the trial court stated that State Farm was unreasonable in not taking Dr. Henry's deposition and in not procuring an independent medical examination after receipt of Dr. Henry's office reports and his written response to the letter inquiry sent to him by Domingue in the course of her handling of the State Farm file.
State Farm appealed, and Reed answered the appeal. The appellate court rejected State Farm's argument that the trial court committed manifest error by: 1) concluding State Farm's September 7, 2001 tender was not a reasonable tender within thirty days from satisfactory proof of loss; 2) concluding a second tender was mandated more than thirty days prior to April 3, 2002; 3) finding State Farm was arbitrary and capricious in failing to make a reasonable investigation; and 4) finding State Farm was arbitrary and capricious in failing to properly evaluate Reed's claim at the time of its partial tender.[6]

DISCUSSION
As noted, by the time this matter was tried, State Farm had tendered the remainder of its UM limits. Thus, the only issue was whether State Farm had violated either LSA-R.S. 22:658 or LSA-R.S. 22:1220 or both.
Louisiana Revised Statutes 22:658 provides in pertinent part:
A. (1) All insurers issuing any type of contract ... shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest.
....
B. (1) Failure to make such payment within thirty days after receipt of such *1020 satisfactory written proofs and demand therefor, as provided in R.S. 22:658(A)(1) ... when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of ten percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, ... together with all reasonable attorney fees for the prosecution and collection of such loss, or in the event a partial payment or tender has been made, ten percent of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney fees for the prosecution and collection of such amount.
Louisiana Revised Statutes 22:1220 provides in pertinent part:
A. An insurer ... owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured.... Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A:
. . . .
(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious or without probable cause.
C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater.
The conduct prohibited in LSA-R.S. 22:658(A)(1) is virtually identical to the conduct prohibited in LSA-R.S. 22:1220(B)(5): the failure to timely pay a claim after receiving satisfactory proof of loss when that failure to pay is arbitrary, capricious, or without probable cause.[7]Calogero v. Safeway Insurance Company of Louisiana, 99-1625, p. 7 (La.1/19/00), 753 So.2d 170, 174. The primary difference is the time periods allowed for payment. Id. Furthermore, LSA-R.S. 22:658 and LSA-R.S. 22:1220 are penal in nature and must be strictly construed. Hart v. Allstate Insurance Company, 437 So.2d 823, 827 (La.1983).
One who claims entitlement to penalties and attorney fees has the burden of proving the insurer received satisfactory proof of loss as a predicate to a showing that the insurer was arbitrary, capricious, or without probable cause. Id. at 828. It *1021 logically follows from this burden that a plaintiff who possesses information that would suffice as satisfactory proof of loss, but does not relay that information to the insurer is not entitled to a finding that the insurer was arbitrary or capricious. Id.; see also, McClendon v. Economy Fire & Casualty Insurance Company, 98-1537, p. 5 (La.App. 3 Cir. 4/7/99), 732 So.2d 727, 730 (Plaintiff's failure to provide insurer with information to confirm that the other driver was under insured barred finding of arbitrary or capricious failure to tender within 60 days.) The sanctions of penalties and attorney fees are not assessed unless a plaintiff's proof is clear that the insurer was in fact arbitrary, capricious, or without probable cause in refusing to pay. Block v. St. Paul Fire & Marine Ins. Co., 32,306, p. 7 (La.App. 2 Cir. 9/22/99), 742 So.2d 746, 751. The statutory penalties are inappropriate when the insurer has a reasonable basis to defend the claim and acts in good-faith reliance on that defense. Rudloff v. Louisiana Health Services and Indemnity Co., 385 So.2d 767, 771 (La. 1980), on rehearing. Especially when there is a reasonable and legitimate question as to the extent and causation of a claim, bad faith should not be inferred from an insurer's failure to pay within the statutory time limits when such reasonable doubts exist. Block, 32,306 at 8, 742 So.2d at 752.
Both LSA-R.S. 22:658 and LSA-R.S. 22:1220 require proof that the insurer was "arbitrary, capricious, or without probable cause,"[8] a phrase that is synonymous with "vexatious." Louisiana Maintenance Services, Inc. v. Certain Underwriters at Lloyd's of London, 616 So.2d 1250, 1253 (La.1993). This court has noted that "vexatious refusal to pay" means unjustified, without reasonable or probable cause or excuse. Id., citing COUCH ON INSURANCE 2d, § 58:70. Both phrases describe an insurer whose willful refusal of a claim is not based on a good-faith defense. Id.
Whether or not a refusal to pay is arbitrary, capricious, or without probable cause depends on the facts known to the insurer at the time of its action, which in the instant case was at the time of its tender of $7,500.00. See Scott v. Insurance Company of North America, 485 So.2d 50, 52 (La.1986). Because the question is essentially a factual issue, the trial court's finding should not be disturbed on appeal absent manifest error. Id. However, when the record does not support the trial court's determination on this issue, the trial court's decision will be reversed. See Darby v. Safeco Insurance Company of America, 545 So.2d 1022, 1028 (La.1989) (An insurer's refusal to tender policy limits pending a legal decision on possible intentional misrepresentation by insured was not unreasonable or without probable cause; a jury's finding to the contrary was clearly wrong.). In the instant case, where the extent of plaintiff's damages was the center of dispute, especially the timing of and need for total knee replacement, the existence of facts such as a previous accident with injury to the same knee can be the basis for reasonable doubt on the insurer's part as to plaintiff's entitlement to the policy limits. Cf. Fontana *1022 v. Louisiana Sheriffs' Automobile Risk Program, 96-2752, pp. 4-5 (La.App. 1 Cir. 6/20/97), 697 So.2d 1037, 1040 (Insurer was not arbitrary in refusing payment or tender when two accidents subsequent to the accident giving rise to his claim could have been the cause of eventual need for back surgery.).
The legislature specifically used the terms "good faith" and "fair dealing" in LSA-R.S. 22:1220, but not in LSA-R.S. 22:658.[9] In that respect, LSA-R.S. 22:1220 restates that which is already stated in the civil code. "Contracts must be performed in good faith." LSA-C.C. art. 1983.[10] The statutes, LSA-R.S. 22:658 and LSA-R.S. 22:1220,[11] impose specific consequences if the insurer's actions do not conform to the obligations imposed therein.
In the instant case, State Farm argues the lower courts erred in finding that its failure to tender more than $7,500.00 was unreasonable, that is, not in good faith, in light of the fact that State Farm never received satisfactory proof of loss from Reed. We agree.
Both LSA-R.S. 22:658 and LSA-R.S. 22:1220 impose upon the claimant an obligation to produce a satisfactory proof of loss. "Satisfactory proof of loss" in a claim pursuant to UM coverage is receipt by the insurer of "sufficient facts which fully apprise the insurer that (1) the owner or operator of the other vehicle involved in the accident was uninsured or under insured; (2) that he [or she] was at fault; (3) that such fault gave rise to damages; and (4) establish the extent of those damages." McDill v. Utica Mutual Insurance Company, 475 So.2d 1085, 1089 (La.1985). Thus, the issue in the instant case, as it was in McDill, is whether the insurer received satisfactory proof of loss; specifically, both cases address whether the insured "fully apprised" the insurer of the extent of damages occasioned by the accident. After an insurer receives notice of the claim, the basis of the claim, and the identity of the doctors involved, in order for the insurer to avoid being arbitrary or capricious, it is necessary for the insurer to determine whether there exists a legitimate basis for not paying at least what it considers to be undisputed. Id. at 1091.
Despite the similarities, there are two significant distinctions between McDill and the instant case. First, the insurer in McDill did not make any tender, whereas State Farm made a tender of $7,500.00, thirty percent of the UM limits. Second, the insurer in McDill admitted it had no evidence to support a contention that the disc surgery which was eventually performed *1023 was not causally related to the injuries sustained in the accident, whereas Reed's medical records prior to the tender of $7,500.00 contained no evidence that a total knee replacement was imminent and causally related to the injuries she sustained in the accident. Thus, the record in McDill supported a finding that the insurer was arbitrary and capricious, but the record in the instant case does not.
Other facts in the instant case support a conclusion that State Farm was not dilatory in making its partial tender and that the amount of the tender was not unreasonable. Reed continued to see Dr. Henry until July 5, 2001, and she was scheduled to return to him in October 2001. Although Reed later testified she had a "conflict" with Dr. Henry, she never alerted State Farm that she intended not to return to him. Instead, she simply did not seek further medical treatment until January of 2002, seven months after her last visit with Dr. Henry. There is no evidence in the record that Reed told State Farm she needed or wanted to go to another doctor.
The trial court criticized State Farm for not deposing Dr. Henry or scheduling an independent medical examination. However, State Farm's decision not to depose Dr. Henry after he responded to State Farm's letter inquiry was reasonable in light of State Farm's legitimate expectation that Reed would be seeing Dr. Henry in October of 2001. It was reasonable to believe any deposition response would not contradict Dr. Henry's medical records and his written response. Additionally, it was unnecessary for State Farm to seek an independent medical examination of Reed because State Farm never disputed her medical condition as reported by Dr. Henry. In this respect the instant case can be distinguished from Mader v. Babineaux, 526 So.2d 505, 508 (La.App. 3 Cir. 1988), in which the insurer questioned the medical opinion of plaintiff's treating physician and the medical test results. In Mader, the court held the insurer should have obtained its own medical opinion to negate the deposition testimony of the treating physician and the MRI report in order to avoid arbitrarily failing to make any tender in a timely fashion. In the instant case, State Farm was not obliged to obtain its own medical opinion because it did not disagree with the medical opinion of the treating physician, Dr. Henry.
Although State Farm eventually paid Reed the remainder of the UM limits when it discovered in Dr. Johnson's deposition testimony that the total knee replacement was causally related to the 2001 vehicular accident, State Farm's handling of the file cannot be evaluated by hindsight. From the date of Reed's first statement that she would need a total knee replacement, State Farm investigated her prior medical history, as well as her treatment post accident with Dr. Henry, and considered her claim as it stood in September of 2001 to be satisfied by the tender. The medical records available to State Farm at that time showed the vehicular accident aggravated a preexisting condition. Until the time Reed consulted Dr. Johnson for the surgery, there were causation questions as to the source of Reed's complaints. Additionally, when State Farm made the partial tender Domingue informed Reed that her file would remain open and told Reed to keep her apprized of further treatment. Thus, the fact that State Farm subsequently tendered the full UM limits is immaterial; State Farm presented a reasonable defense for the timetable in which it tendered payment. Cf. Duncan v. Allstate Insurance Company, 01-840, pp. 8-9 (La.App. 5 Cir. 12/26/01), 803 So.2d 420, 425, writ denied, 02-0575 (La.4/26/02), 814 So.2d 562 (In light of claimant's preexisting condition, insurer's delay of 15 months *1024 in making tender was not arbitrary or capricious.).

CONCLUSION
To summarize, we conclude State Farm's September 7, 2001 partial tender was neither untimely nor inadequate, as Reed did not supply State Farm with satisfactory proof of loss in excess of the $7,500.00 tendered more than 30 days prior to the tender. The trial court was clearly wrong in its contrary finding. Additionally, because State Farm first received a medical opinion at Dr. Johnson's deposition that there was a causal connection between Reed's total knee replacement and the vehicular accident, its tender of the remainder of the UM limits was timely and reasonable. Thus, the record fails to support the trial court's finding to the contrary.
Having found that the lower courts erred, we reverse the judgment against State Farm Mutual Automobile Insurance Company and in favor of plaintiff, Bonnie D. Reed, and dismiss her suit with prejudice. We pretermit all other issues urged by the parties.
REVERSED AND RENDERED.
NOTES
[1] State Farm indicates this procedure is used in order to protect their insureds' privacy. Each claims file is handled separately as if each claim were being handled by different insurance companies, requiring a separate authorization for each claims file to allow sharing of medical information between the files. If the underlying liability coverage is adequate, there is no reason for the UM claim specialist to have medical records. Although the plaintiff questioned the need for her to provide two authorizations, there was no evidence to establish State Farm's procedure was designed to prejudice a claimant.
[2] Significantly, Reed's allegations that State Farm was arbitrary, capricious, or without probable cause relate to State Farm's handling of her claim for the UM policy limits. She asserted no action against State Farm for its processing of her claim for the liability policy limits.
[3] State Farm's "ACTIVITY LOG" reveals that Dr. As well responded on August 15, 2001, that he had not treated Reed after the accident.
[4] The ACTIVITY LOG reveals Domingue ordered a request that the medical records be properly identified prior to consideration by her of payment of these expenses.
[5] At trial Reed admitted she was making no claim that the vehicular accident caused or aggravated the migraine headaches. In her answers to interrogatories, Reed also admitted she had applied for Social Security disability benefits in August of 2001. At her deposition she testified that she had filed an earlier application in 1999, which had been denied. Her 2001 application listed numerous other ailments in addition to the knee pain and migraine headaches.
[6] Because of our decision concerning the lower courts' dispositions of these questions, it is unnecessary to discuss the other issues addressed by the court of appeal. See Reed v. State Farm Mutual Automobile Insurance Company, 02-804 (La.App. 3 Cir. 12/11/02), 832 So.2d 1132.
[7] We note the jurisprudence generally uses the terms "arbitrary and capricious" despite the fact the statutory provisions use the disjunctive "arbitrary, capricious, or without probable cause." Regardless, the definitions of the terms "arbitrary" and "capricious" are almost indistinguishable from each other. An "arbitrary" act is an act "based on random choice or personal whim, rather than any reason or system." THE NEW OXFORD AMERICAN DICTIONARY 80 (Elizabeth J. Jewell & Frank Abate eds., 2001). "Capricious" action is "given to sudden and unaccountable changes of behavior." Id. at 256. A judicial "decision founded on prejudice or preference rather than on reason or fact" is often termed "arbitrary and capricious." BLACK'S LAW DICTIONARY 100 (7th ed.1999).
[8] The same language is used in the workers' compensation law. For example, reasonable attorney fees are awarded as a penalty when an employer discontinues payment of benefits if the "discontinuance is found to be arbitrary, capricious, or without probable cause." LSA-R.S. 23:1201.2. In that context, this court has defined arbitrary and capricious behavior as "willful and unreasonable action, without consideration and regard for the facts and circumstances presented." J.E. Merit Constructors, Inc. v. Hickman, 00-0943, p. 5 (La.1/17/01), 776 So.2d 435, 437.
[9] Thus, the legislature has legally imposed the moral and ethical obligation of good faith and fair dealing, concepts which should be self-evident and self-imposed. No law should be necessary to impose an obligation of good faith and fair dealing.
[10] See also, LSA-C.C. art. 1759 which provides: "Good faith shall govern the conduct of the obligor and the obligee in whatever pertains to the obligation."
[11] The parties point out there is a split in the circuit courts regarding whether the penalty in LSA-R.S. 22:1220 is mandatory or discretionary. See for example, Reed, 02-804 at 10, 832 So.2d at 1140; The Sultana Corporation v. Jewelers Mutual Insurance Company, 01-2059, p. 2 (La.App. 1 Cir. 12/31/02), 837 So.2d 134, 136, writ granted, XXXX-XXXX (La.4/25/03), 842 So.2d 387; Harrington v. Cato Corporation, 32,055, pp. 3-4 (La.App. 2 Cir. 6/16/99), 740 So.2d 732, 735; Adams v. Stratton, 02-224, p. 4 (La.App. 5 Cir. 10/16/02), 831 So.2d 290, 291, writ denied, 02-2792 (La.2/7/03), 836 So.2d 101. Because we resolve the instant case by concluding there was no violation of the statutes by State Farm, this is not the proper forum in which to address the split in the appellate court decisions.