MURPHY, J.
| j Appellants, Advanced Sleep Center, Inc. and Advanced Neurodiagnostic Center, Inc., have appealed the trial court judgment in favor of defendant, Certain Underwriters at Lloyd’s London.[1] For the reasons that follow, we affirm the judgment of the trial court.
FACTS AND PROCEDURAL HISTORY
Defendant issued a policy of insurance to insure plaintiffs’ property, (hereinafter referred to as “the subject property”), which consists of a three-story stucco building, located at 2905 Kingman Street in Metairie, Louisiana, for the policy period from June 29, 2012 to June 29, 2013. Hurricane Isaac struck the area where the subject property is located on August 29, 2012. On October 11, 2012, Dr. Morteza Shamsnia, one of the owners of the plaintiff corporations, submitted a property loss notice to their insurance broker asserting that winds from the hurricane caused damage to the subject property’s roof, which resulted in damaged flooring, and that “damage to the building caused power outage and medicines were destroyed.” Defendant denied coverage for the alleged losses and plaintiffs filed suit.
At trial, Daniel Onofrey testified that he is a licensed commercial contractor and has worked in the construction industry for forty years. Prior to 2008, he was an insurance adjuster and handled property damage claims for insurance companies and property owners. Mr. Onofrey had a long standing relationship with Dr. Shams-nia. At the time Hurricane Isaac struck, he was in the process of constructing a building for Dr. Shamsnia, located next door to the subject property. Dr. Shamsnia asked Mr. Onofrey to look at the subject property after Hurricane Isaac. Mr. Onofrey met with Dr. Shamsnia’s maintenance man, identified as |2Mohammad Tareh, to repair the roof of the subject property. In repairing the roof, Mr. Tareh applied an elas-tomeric coating to the roof.
Mr. Onofrey testified that there was widespread water damage to the building, which was caused by water intrusion from Hurricane Isaac. In his deposition, Mr. Onofrey stated that the leaks into the building were caused by the parapet wall surrounding the roof. At trial, Mr. Onofrey testified that water came in through the flashing for the parapet wall, explaining that the flashing “waffled up” allowing water to enter. Mr, Onofrey stated that he had recently realized that the flashing “was lifting and a breach of the counter flashing caused water intrusion” and this was the only thing that could cause so much widespread damage. Mr. Onofrey stated that this damage to the flashing was visible, and referred to pictures of the flashing, which Mr. Onofrey stated was “waffling up.”
*1223 At Dr. Shamsnia’s request, Mr. Onofrey prepared a repair estimate for damage to the building alleged to be caused by the hurricane. The estimate includes the costs to repair roof leaks and the exterior stucco, as well as numerous interior repairs throughout the building including replacing insulation, ceiling tiles, flooring, cabinetry, countertops, sinks, light fixtures, cameras, smoke detectors, blinds, window hardware, replace and/or repair and paint drywall, and paint molding and doors. The total estimated cost of these repairs was $369,693.89. Mr. Onofrey explained that this estimate was compiled from items Dr. Shamsnia pointed out as they walked through the building, Mr. Onofrey took notes during this inspection but he no longer had the notes at the time of trial. Mr. Onofrey testified that he did not take pictures during this inspection. Mr. Ono-frey was listed as the insured’s contact person on the property loss claim form.
Mr. Onofrey testified that he inspected the building with the adjuster assigned to the claim by defendant, J. Scott McClary. Mr. Onofrey pointed out [¡¡damage to the building as he walked through the building with Mr. McClary. Mr, Onofrey accompanied Mr. McClary to the roof of the building.
Dr. Shamsnia, a professor of neurology, testified that he and his wife work in the subject building, where they operate a sleep study center and a neurodiagnostic center. He testified that defendant inspected the property twenty-eight days before the storm and determined the building was in “good standing.”
Dr. Shamsnia stated that he and his wife, Simin Mirtaheri, evacuated to Los Angeles for Hurricane Isaac. When he went into the building after the storm, there were multiple areas of damage on the second and third floors from water getting into the building from the windows and roof. He instructed his “superintendent,” Mohammad Tareh, to make the necessary repairs to stop water from leaking into the building from the roof. Mr. Tareh tightened the screws on the roof and changed the seals at the bottom of windows. Mr. Tareh also picked up wet carpet and dried it. Some of the carpet was replaced with laminate flooring. The minimum amount of repairs were done to make the building functional so Dr. Shamsnia and his wife could resume patient care. Dr. Shamsnia did not have an invoice or a list of the repairs performed by Mr. Tareh.
After Mr. Tareh worked on the roof, Dr. Shamsnia had roofing work performed by the roofing contractor who was working on his new building. Dr. Shamsnia was told by this contractor that the roof needed to be replaced. Dr. Shamsnia testified that the roof had not been replaced and it can be observed that the “flanges and all of that are bent.” Dr. Shamsnia testified that the water damage inside the building is' obvious—there are water stains on the ceiling and walls throughout the building, some of the windows are “buckled,” and the building smells ft’om the water damage. In Dr. Shamsnia’s view the pictures of the building that were entered into evidence do not show all of the damage to the building.
|4In addition to the damage to the building, plaintiffs also submitted a claim for loss of medications. Dr. Shamsnia testified that there were medications in the building which had to be stored at a constant temperature. These medications are ruined if they are not held' at the recommended temperature for more than twenty-four hours. Dr. Shamsnia retained the ruined medications and pictures of the ruined medication were submitted into evidence at trial. Dr. Shamsnia testified that there was a “direct power loss” to the building based on the inspection performed by “his” electrician.[2] He gave a copy of the electri- *1224 eian’s report to defendant’s adjuster. Although defendant denied that this report was dated, Dr. Shamsnia testified that the report was dated.
Dr. Shamsnia received the letter denying his claim for damages in December 2012. In July 2013, he contacted Daniel Scott Claire, a public insurance adjuster, to inspect the building. Mr. Claire prepared a second repair estimate which totals $142,597.00. On July 30, 2013, Dr. Shamsnia mailed this repair estimate, along with a letter, to defendant stating that he disagreed with the decision to deny the claim and requested to proceed under the “request for appraisal” provision of the policy. Dr. Shamsnia testified that he did not receive a response to this letter from defendant; however, the property was reinspected by defendant in August 2013.
Glen Scarsone, an engineer for Entergy, which supplied power to the subject building, testified that there was a widespread power outage in Metairie which began at 6:01 a.m. on August 29, 2012 and lasted over twenty-four hours. He explained that the subject property was located in the area that was affected by the power outage.
■ J. Scott McClary testified that he works for Worley Catastrophe Response. This claim was assigned to Worley on October 15, 2012. Mr. McClary testified Rthat the initial adjuster assigned to the claim was unable to get in touch with plaintiffs to inspect the property before the claim was reassigned to Mr. McClary. Mr. McClary was assigned the claim on November 4, 2012 and he inspected the property on November 13, 2012. Mr. Onofrey accompanied Mr. MeClary during his inspection of the building. Mr. McClary took numerous photographs of the property during the inspection, which were admitted into evidence. ,
Mr. McClary testified that Mr. Onofrey told him that repairs were made to the second floor of the building, including replacing the flooring and ceiling tiles. Mr. McClary asked for pictures of the building prior to repairs being made and Mr. Ono-frey stated he would provide the pictures. However, pictures of the building prior to repairs were never provided. Mr. McClary was told that repairs had not been made to the third floor of the building. Mr. McClary was not able to access all areas of the third floor due to patients being present. Photographs taken by Mr. McClary depict the lobby and hallways of the third floor. The carpet and ceiling tiles have not been replaced. Mr. McClary testified that he did not see any water damage on the third floor of the building.
Mr. McClary testified that the pictures of the front of the building do not show any exterior damage to the building, including the roof. Mr. McClary explained that the roof of the building is made of sheet metal consisting of panels that are held down with screws and held at the edges by fasteners. While inspecting the roof, he looked for evidence of movement of the panels, such as loosened fasteners, and movement of the seams. He explained that if the panel moved, the area of the panel which the fastener previously covered would be cleaner than the surrounding area. He did not see any evidence of movement of the panels. He inspected the area around the parapet wall, noting that this area can be a “problem” on this type of roof. He did not see any loosening of the seams or ^fasteners. He went over the numerous pictures he took of the roof and explained that they did not show any damage to the roof. Mr. McClary referred to pictures of the flashing which Mr. Onofrey stated was “waffling up.” Mr. McClary was unsure of what “waffling up” meant, but testified that the flashing on this building looked normal. Mr. McClary pointed out that the pictures show maintenance on the roof such as elastometric sealant around *1225 the roof vents; this is normal maintenance for this type of roof.
Mr. McClary explained that the insurance policy issued by defendant on this property only covers interior damage if it is caused by water entering the building due to damage to the roof or exterior of the building. Mr. McClary recommended that the claim be denied because he saw no damage to the roof or exterior of the building. Mr. McClary further explained that the policy only covered losses for contents of the property that were caused by a power failure that occurred on the premises. He recommended that the claim for the ruined medications also be denied because the power failure was caused by an off premises, widespread power outage in the area.
Mr. McClary inspected the property for the second time on August 15, 2013. At that inspection, he was accompanied by Dr. Shamsnia and Mr. Claire. Mr. McClary again took numerous pictures of the property. Mr. McClary went over these pictures during trial and testified that there was no difference in the building between his initial inspection on November 13, 2012 and the second inspection on August 15, 2013. Mr. McClary went over several pictures of the roof taken during the second inspection. Referring to the south and southwestern areas of the roof, he explained that there was no evidence of wind damage. He testified that there was no evidence of any movement of the panels, flashing or screws of the roof.
Mr. McClary testified that the third floor of the building was in the same condition as it was on his prior inspection of November 2012. The same carpet was in place and did not show any water damage.
Following the second inspection, Mr. McClary wrote a report recommending that the claim be denied because there was no storm created opening in the roof that caused interior water damage. He took pictures of the ruined medications but further recommended that this claim be denied because the loss of power was due to an off premises power failure.
Kevin Vanderbrook, who was stipulated to and accepted by the court as an expert in engineering, testified that he inspected the property in April of 2015. He inspected the interior and exterior of the building and did not see any water damage. He went over photographs taken during his inspection of the interior of the building, which did not show any water damage to the walls or ceiling.
Mr. Vanderbrook inspected the roof of the building, which he described as a low-sloped corrugated metal roof which slopes towards the rear of the building that faces west and is protected by a parapet wall. Mr. Vanderbrook opined that the only susceptible area of the roof is the rear, which is opened. He inspected this area for any type of wind damage that had not been repaired. He explained that the rubber washers between the metal and the screws deteriorate over time. During his inspection he noted one loose screw. This screw had been covered by a type of foam that is not intended for exterior use. Mr. Vander-brook explained that the screws work themselves out over time and this is not related to wind damage.
Mr. Vanderbrook testified that he carefully inspected the flashing around the parapet wall because this is a potential area for water intrusion. The inspection did not reveal anything that was loose or had been changed or repaired. When questioned as to “waffling” of the flashing, Mr. Vanderbrook opined that [ ¡/‘waffling” can occur from temperature changes, which is a not an unusual occurrence in flashing. “Waffling” is not indicative of-wind damage. Mr, Vanderbrook did not observe “waffling” on the flashing. According to Mr. Vanderbrook, there was no evidence *1226 to support any damage that would have caused the seams of the roof to separate.
Mr. Vanderbrook referred to photographs of the conduit containing the pow-erlines to the building. If the power to the building had previously been via a wire attached to the building, he would have seen evidence of a bracket having been removed. Mr. Vanderbrook testified that there is no indication of damage to the power supply to the building.
Mr. Vanderbrook explained that when this type of roof is damaged, the edges bend upward and pull the fasteners out. His inspection did not reveal that this roof had been bent upwards. Mr. Vanderbrook testified that based on the pictures taken by Mr. McClary in November 2012, the roof was in the same condition as when he inspected it in April 2015. Mr. Vander-brook explained that Hurricane Isaac had low wind speeds and this type of roof is designed to resist damage from that type of weather. Mr. Vanderbrook concluded that there was no wind created opening from Hurricane Isaac that allowed water to enter the building. The repair estimate prepared by Mr. Onofrey lists damage to every room of the building. According to Mr. Vanderbrook, the lack of physical damage to the exterior of the building and the roof does not correspond to the inflated damages listed by Mr. Onofrey.
At the conclusion of trial, the trial judge took the matter under advisement. On April 8, 2016, the trial judge issued judgment in favor of defendant dismissing plaintiffs’ claims with prejudice. This timely appeal followed.
JciLAW AND DISCUSSION
On appeal, plaintiffs argue that the trial judge committed reversible error by: (1) requiring plaintiffs to prove that the exclusionary provisions do not apply rather than having defendant prove why the exclusions do apply, (2) misinterpreting the phrase “satisfactory proof of loss,” (3) misinterpreting the. fiduciary duty of defendants to investigate the claim, and (4) misinterpreting the appraisal provision of the policy and excusing defendant from the appraisal process.
Defendant responds that plaintiffs bore the burden of proving coverage under the policy and were required to prove that the wind created an opening through the roof which caused water to enter the building. Defendant contends plaintiffs offered no evidence to show any damage to the roof or the exterior of the building.
BURDENS OF PROOF
The insured bears the burden of proving that a claim falls within the policy coverage. Doerr v. Mobil Oil Corp., 00-947 (La. 12/19/00), 774 So.2d 119. However, the insurer has the burden of proving the claim is not covered due to the applicability of an exclusionary clause within the policy. Id. at 124. An insured, seeking to recover under an insurance contract, has the burden of proving every fact essential to his cause of action. Rosen v. United States Auto Assn, 12-284 (La. App. 4 Cir. 11/14/12), 235 La. 511, 104 So.2d 633, 639; Collins v. New Orleans Pub. Serv., Inc., 234 So.2d 270, 272 (La. App. 4 Cir. 1970), writ refused, 256 La. 375, 236 So.2d 503 (1970).
Section A of the insurance policy insuring the subject property provides:
A. Coverage
| mWe will pay for direct physical loss of or damage to Covered Property at the premises described in the declarations caused by or resulting from a Covered Cause of Loss.
Coverage under the policy lists causes of loss, including section C which states:
C. Limitations
The following limitations apply to all policy forms and endorsements unless otherwise stated.
*1227 1. We will not pay for loss of or damage to the property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.
[[Image here]]
c. The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice sand or dust, whether driven by wind or not, unless:
(1) the building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet ice, sand, or dust enters...
Section B of the causes of loss contains exclusions, which state in pertinent part:
B. Exclusions ■
1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
[[Image here]]
c. Utility Service
The failure of power or other utility service supplied to the described premises, however caused, if the failure occurs away from the described premises.
Thus, the policy provides coverage for interior damage of the building if there is damage to the roof or exterior of the building which allows water to enter the property. Accordingly, plaintiffs had the burden of proving damage to the roof |nor exterior of the property caused by Hurricane Isaac that allowed water to enter the property and damage the interior of the property.
Further, the policy excludes coverage for contents of the building -that are damaged due to a power outage that does not occur on the premises. Accordingly, defendant had the burden of proving the claim for ruined medications was caused by a power outage that did not occur on the premises.
In an attempt to carry their burden of proof, plaintiffs presented the testimony of Mr. Onofrey, who prepared a detailed estimate of the cost of repairs for damage allegedly caused by Hurricane Isaac. Mr. Onofrey testified that there was widespread water damage to the building, which was caused by water intrusion from Hurricane Isaac. In his deposition, Mr. Onofrey stated that the leaks into the building were caused by the parapet wall surrounding the roof. At trial, Mr. Onofrey testified that water came in through the flashing for the parapet wall, explaining that the flashing “waffled up” allowing water to enter. Mr. Onofrey stated that he had recently realized that the flashing “was lifting and a breach of the counter flashing caused water intrusion” and this was the only thing that could cause so much widespread damage. Mr. Onofrey stated that this damage to the flashing was visible, and referred to pictures of the flashing, which Mr. Onofrey stated was “waffling up.” Mr. Onofrey acknowledged that he was a licensed contractor but was not ah engineer.
Plaintiffs also presented the testimony of Dr. Shamsnia who testified that some rfepairs were performed on the roof after the storm. No documents were presented to describe the roof repairs, nor were any invoices submitted for labor or materials for the repairs. Dr. Shamsnia testified that the roof had not been replaced and it can be observed that the “flanges and all of that are bent.” Dr. Shamsnia was 112told by a roofing contractor that the roof heeded *1228 to be replaced. Dr. Shamsnia testified that some windows are “buckled.”
Defendant presented the testimony of Mr. McClary who testified that there was no visible damage to the roof or exterior of the building on either of the two inspections he performed. He was unsure of what Mr. Onofrey meant by stating the flashing was “waffling up,” but he testified that the flashing looked normal in the photographs.
Defendant also presented the testimony of Mr. Vanderbrook, who was accepted by the trial court as an expert in engineering. Mr. Vanderbrook testified that the “waffling up” of the flashing that Mr. Onofrey referred to occurs due to the variations in temperatures. Mr. Vanderbrook testified that there was no waffling of the flashing depicted in the pictures of this roof. Mr. Vanderbrook gave detailed testimony regarding his inspection of the roof. His inspection of the flashing did not reveal any areas that had been repaired or replaced. He explained that when this type of roof is damaged, the edges bend upwards and pull the fasteners out. His inspection did not reveal that this roof had been bent upwards. Although he did observe one loose screw on the roof, this is a normal occurrence on this type of roof and was not caused by wind. Mr. Vanderbrook did not observe any evidence that the seams of the roof had separated or that the panels of the roof had become loose.
Although Mr. Onofrey and Dr. Shamsnia testified that there was damage to the roof that had been repaired, they did not offer any pictures of the condition of the roof prior to the repairs. Dr. Shamsnia testified that Mr. Tereh repaired the roof after the storm, yet Dr. Shamsnia did not produce any documents to show exactly what repairs were performed. Dr. Shamsnia testified that Mr. Tareh is an hourly employee; however, Dr. Shamsnia did not submit any documentation | ^related to the time spent for repairs of the roof. Plaintiffs did submit an unsigned, undated report that appears to have been prepared by William Ricely,[3] which states that in his opinion the “metal roof panels were lifted and the fastening grommet screws were ripped up from the metal purling that they were secured to along the leading edge of the bottom of the roof (on the lower east corner of the roof)” by the winds from Hurricane Isaac. However, this report was refuted by the testimony of Mr. McClary and Mr. Vanderbrook, who both stated that there was no evidence that the roof had been pulled up or that the fasteners had become loose or were replaced or that the panels shifted. Mr. Onofrey testified that visible damage could be seen in the pictures taken by Mr. McClary; however, this was refuted by Mr. McClary and Mr. Vanderbrook. The trial court relied on the testimony of Mr. McClary and Mr. Van-derbrook in determining that there was insufficient evidence to support plaintiffs’ theory that waffling of the flashing along the parapet wall caused by the hurricane allowed water intrusion. Thus, the trial court’s determination that plaintiffs failed to prove that the insured property sustained an opening in the roof which allowed water to enter the building causing interior damage is supported by the record.[4]
*1229 With regard to plaintiffs’ claim for loss of medications caused by the power outage, defendant presented the testimony of Mr. Scarsone, an Entergy engineer, who testified that the subject property was included in the area of a widespread power outage which began on August 29, 2012 at 6:01 a.m. and lasted over | utwenty-four hours. Contrary to plaintiffs’ assertion that the wind pulled the power supply from the building,[5] Mr. Vanderbrook testified that there was no evidence to show an on the premises power outage, and further that the power to this building is supplied in a covered conduit. Relying on the testimony of Mr. Scarsone and Mr. Vanderbrook, the trial court found that the medication spoliation was not covered under the policy because the power outage occurred off the premises. This finding is supported by the record.
Having found that the trial court did not commit an error of law as defendant contends, the trial court’s finding is subject to the manifest error standard of review on appeal. Under the manifest error standard of review, where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844-45 (La. 1989). The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfin-der’s conclusion was a reasonable one. Sto-bart v. State through DOTD, 617 So.2d 880, 882 (La. 1993). Thus, where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Id
The trial court in this case was presented with two opposing views of the evidence—either Hurricane Isaac caused an opening in the roof of the insured property which caused water to enter the property, or the hurricane did not cause an opening in the roof of the property which allowed water to enter. The trial court found that there was “insufficient evidence to support waffling of the flashing |1fialong the parapet wall caused by the hurricane.” This finding is supported by the record based on the testimony of Mr. McClary and Mr. Van-derbrook. Thus, the trial court did not err in finding that there was “insufficient evidence to support waffling of the flashing along the parapet wall caused by the hurricane.”
Further, the trial court did not err in its finding that the spoiled medication was caused by an off premises power outage, as this finding is supported by the record. Defendant presented testimony from the power company’s representative that there was a widespread power outage affecting this property which began on August 29, 2012 at 6:01 a.m. and lasted over twenty-four hours. Plaintiffs’ assertion that the power was disconnected from the building by wind was refuted by Mr. Vanderbrook, who testified that the power to the building was supplied by a powerline inside of a conduit, and further that there was no *1230 evidence of a bracket holding a powerline to the building which had been removed.
SATISFACTORY PROOF OF LOSS
Plaintiffs acknowledge that their cause of action against defendant for penalties under La. R.S. 22:1892 and La. R.S. 22:1973 for failing to promptly adjust and pay their claim is dependent upon whether they provided defendant with satisfactory proof of loss. Plaintiffs argue that the trial court erred in finding that they did not supply satisfactory proof of loss.
It is well settled that a “satisfactory proof of loss” is only that which is “sufficient to fully apprise the insurer of the insured’s claims.” Louisiana Bag Co., Inc. v. Audubon Indem. Co., 08-453 (La. 12/2/08), 999 So.2d 1104, 1119. As a predicate to showing that the insurer was arbitrary and capricious or without probable cause, the insured bears the burden of proving that the insurer received satisfactory proof of loss. Reed v. State Farm Mut. Auto Ins. Co., 03-107 (La. 10/21/03), 857 So.2d 1012, 1019. Notice of a claim does not fully apprise the 110insurer of the claim and extent of damages and is not sufficient to constitute satisfactory proof of loss. See, Aunt Sally’s Praline Shop, Inc., v. United Fire and Casualty Company, 2009 WL 1702029 (E.D. La. 2009).
The evidence at trial established that plaintiffs submitted an estimate for repair of damages alleged to have been caused by Hurricane Isaac to defendant. However, when Mr. McClary inspected the property on behalf of defendant, he did not find any evidence of damage to the roof or the exterior of the building which was required under the policy to allow coverage for plaintiffs’ alleged loss. Further, although Mr. Onofrey and Dr. Shamsnia testified that there was damage to the building which was repaired, no evidence was submitted to support this testimony—there were no pictures of the property prior to the repairs being made and no documents related to labor or materials for the repairs. Additionally, although Mr. Onofrey and Dr. Shamsnia testified that there was still visible damage to the building, both Mr. McClary and Mr. Vanderbrook testified that there was no visible damage to the building. Based on the lack of evidence presented by plaintiffs at trial and the testimony of Mr. McClary regarding his inspection of the building, plaintiffs failed to prove that they provided defendant with satisfactory proof of loss. Accordingly, the trial court correctly found that plaintiffs are precluded from obtaining statutory penalties for defendant’s alleged failure to pay their claim.
DUTY TO INVESTIGATE
Plaintiffs argue that defendant breached its fiduciary duty and failed to fulfill its obligation to take affirmative steps to accumulate the necessary facts to investigate this claim. Specifically, plaintiffs claim that defendant breached its duty by relying on the recommendation of Mr. McClary to deny their claim.
l17In support of this argument, plaintiffs rely on the case of Varmall v. Bankers Specialty Ins. Co., 15-223 (La.App. 5 Cir. 10/28/15), 178 So.3d 181. In Varmall, this Court held that an insurer may not in good faith rely on the opinion of an adjuster who is unable to determine the cause of interior water intrusion and who took no further steps to determine the source of the water intrusion, especially when the adjuster has no expertise in determining the cause of damages. Id. at 190. However, the facts of the case at bar can easily be distinguished from those in Varmall. In Varmall, the adjuster did observe water damage to the insured property, whereas in the ease at bar, Mr. McClary testified repeatedly that he did not observe any water damage on the interior of the property. Rather, Mr. McClary was only told by Mr. Onofrey that there was interior *1231 water damage, consisting of damage to the floors and ceiling that had been repaired prior to Mr. McClary’s inspection. Mr. McClary testified that he requested information from plaintiffs to support the claim of interior water damage but plaintiffs failed to comply with this request. Although Mr. Onofrey told Mr. McClary he would provide him with pictures of the condition of the interior of the building prior to the repairs being made, Mr. Ono-frey ignored Mr. McClary’s request for pictures. At trial, Mr. Onofrey testified that he had not taken any such pictures. In addition, with regard to the power outage, Mr. McClary testified that Ms. Mirtaheri told him there was a widespread power outage in the area causing loss of power to the building. Mr. McClary testified that he was investigating numerous claims of damage from Hurricane Isaac at the time he was investigating plaintiffs’ claim and was aware of the widespread power outages as a result of these investigations. When Mr. McClary was presented with an undated document from Spark Electric purportedly showing that a repair to the power supply for the building was performed, Mr. McClary attempted to obtain further information to substantiate plaintiffs’ claim that the power outage was caused by the power supply being | ^disconnected from the building; however, plaintiffs and Spark Electric failed to provide any further information.
Based on the testimony presented at trial, we find no evidence that the trial court misinterpreted defendant’s duty to investigate the claim.
APPRAISAL
Plaintiffs argue that the trial court misinterpreted the appraisal provisions of the insurance policy.
Section E of the Building and Personal Property Coverage Form contains the following:
D. Loss Conditions
The following conditions apply in addition to the Common Policy Conditions and the Commercial Policy Conditions
[[Image here]]
2. Appraisal
If we and you disagree on the value of the property or the amount of the loss, either may make written demand for an appraisal of the loss....
If there is an appraisal, we will still retain our right to deny the claim.
The deposition of the claims manager, Heather O’sullivan, was admitted into evidence. Ms. O’sullivan is defendant’s corporate representative and supervisor of the management of this claim. She testified that the word “loss” in the appraisal provision refers to the financial amount of the loss rather than the physical damage. She explained that the appraisal clause is triggered when the insured and the insurer cannot agree on the amount of the cost to repair damages to an insured property. In this case, there was not a disagreement with regard to the amount of the loss; rather there was a disagreement as to whether the property sustained any loss that was covered under the policy. Hence, the appraisal clause [ 19under the policy was not applicable. In any event, the evidence indicates that defendant did not ignore plaintiffs’ request to proceed under the appraisal clause. The evidence indicates that defendant had Mr. McClary inspect the property a second time and also had the property inspected by an engineer, Mr. Vanderbrook, who explained how he inspected the roof for any signs of wind damage. Further, in the letter requesting to proceed under the appraisal clause, plaintiffs imply that they received a damage estimate from defendant. However, the record is clear that plaintiffs never received a damage estimate from defendant. For all of the above reasons, the trial *1232 court correctly found that proceeding under the appraisal clause of the policy was not appropriate in this case.
CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED

. The Certain Underwriters at Lloyd's London include ACE. Global Markets, Sagicor at Lloyd’s, Ascot, Argo International, W.R. Berk-ley, and Canopius.

. Apparently, Dr, Shamsnia is referring to Kevin Williams of Spark Electric.

. Defendant argues that this report should be stricken from the record because it was not properly admitted into evidence. The transcript of the trial indicates that this document was introduced into evidence along with the deposition of Heather O'sullivan. When the deposition was introduced into evidence, the trial judge questioned plaintiffs’ counsel about the documents attached to the deposition. Plaintiffs offered these documents in globo with the deposition and they were received into evidence without objection by defendant. Thus, defendant’s motion to strike was denied.

. The record indicates that plaintiffs claimed extensive damage to the interior of the subject building. Both Mr. Onofrey and Dr. Shamsnia *1229 testified that some flooring and ceiling tiles were replaced after Hurricane Isaac due to water damage. However, no photographs were taken of the damage prior to repairs. Contrary to the testimony of Mr. Onofrey and Dr. Shamsnia, Mr. McClary and Mr. Vander-brook testified that the pictures taken during Mr. McClary’s inspections of the building do not show any water damage.

. Plaintiffs attempted to carry their burden of proving that the power outage occurred by the power supply being disconnected from the building with an undated statement from Spark Electric. Plaintiffs did not respond to Mr. McClary’s requests for documentation to substantiate this statement, such as a dated statement and/or a check for services performed as a result of this statement.