McCALLUM, J.
*1178 This lawsuit results from a significant crack located in the foundation of a house in Downsville, Louisiana, owned by Toby and Sherri Shreve ("Shreves"). A jury found the crack was caused by a tree falling on the house, which was covered by their homeowner's insurance policy with State Farm. The jury also found that State Farm, which had denied the Shreves' claim on the basis that the crack was caused by differential settlement, had been unreasonable, arbitrary, and capricious in handling the claim. State Farm filed a motion for a JNOV on the issue of State Farm's bad faith, and the trial court granted the motion. The Shreves have appealed the granting of the JNOV. We affirm.
FACTS
Sherri Shreve has lived in the house since 1994, and Toby Shreve began living there after their marriage in 2000. On October 9, 2009, a large oak tree fell across the right front of the house causing extensive damages. At the time, State Farm insured the Shreves' home.
The Shreves selected Smith Builders, a contractor in State Farm's Premier Service Program, to repair the damage. While the house was being repaired, the Shreves lived in a motel and then in a house they rented before returning to their own house in January of 2010. In February of 2010, one of Smith's workers came to the house to repair kitchen cabinets which had pulled away from the wall.
In late December of 2011, the Shreves heard what they described as a loud "gunshot" sound in the house. They were unable to determine the origin of the sound. In April of 2012, the heel of Sherri's shoe went through the linoleum floor in the master bathroom. A large crack running the entire width of the rear of the house was eventually discovered. The Shreves did not see the crack when the flooring in the entire house was replaced in 2000, or when the flooring in the hallway, dining room, and kitchen was replaced after the tree fell on the house.
On August 10, 2012, Sherri notified her State Farm agent of the claim regarding the crack. Later that month, State Farm wrote to the Shreves that there was a question as to whether State Farm was obligated under the policy for the crack, and that the cause of the crack was being investigated. The policy excluded coverage for losses caused by "settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundation, walls, floors, roofs or ceilings[.]"
State Farm contacted Donan Engineering to evaluate the cause of the crack in the slab and to provide an indication of the scope of the repair job. Timothy Hassenboehler, a forensic engineer for Donan, visited the house on August 22, 2012. The Shreves were present during his visit and pointed out areas of concern. Sherri recalled that by that time the crack had grown, the floor had become uneven and doors would not shut.
Hassenboehler prepared a report on August 27, 2012. Hassenboehler noted in his report that the crack in the bathroom was one inch wide and three inches deep, without any reinforcing steel in it. The crack, which spanned the entire width of the south-facing house, was one to two feet from the north wall of the house. The crack could be felt under the flooring in the kitchen, master bedroom, and adjacent bedroom.
Hassenboehler also noted in his report that drywall at numerous locations in the house was cracked or delaminated, many closet and cabinet doors were out of plumb, there was a large hump in the living room floor, the hallway floor was *1179 not level, and soft spots could be felt under the floor in the living room and kitchen.
Hassenboehler observed a large diagonal crack in the brick veneer on the west side of the house, with the crack widening as it went up. There were numerous additional cracks on this wall. Hassenboehler also observed that the concrete slab had many cracks, with the west side having the most amount of cracking. It was obvious that repairs involving application of a sealant had been attempted in the horizontal cracks on the west side of the house, while numerous vertical cracks on that side showed no signs of repair. Hassenboehler, who saw a void that was one inch deep under the grade beam on the north side of the house, also found the subsurface soils at this wall to be moist.
Hassenboehler attached to his report a statewide drought monitor map of Louisiana from the USDA dated August 21, 2012. This map showed Ouachita Parish as being under a severe drought. Hassenboehler found that the slab had been significantly damaged throughout the house, with damage to the interior portion of the slab as well as to the exterior grade beam. He concluded that: (1) North Louisiana had been undergoing a severe to extreme drought; (2) the drought caused differential settlement; (3) long-term differential settlement had dislodged the plumbing under the house; (4) the influx of additional water from leaking plumbing caused erosion of the soils under the slab; (5) the erosion caused the exterior grade beams of the slab to settle; (6) the settlement caused the concrete slab to crack; and (7) the erosion will continue and the crack will grow larger until the plumbing is repaired. He further concluded that the cracked concrete was not a result of damage from the fallen tree.
On September 4, 2012, Brian Griffin, a State Farm associate, wrote to the Shreves that State Farm had determined that the damage to their house's concrete slab was caused by ground movement and, therefore, not covered by their policy.
The Shreves filed suit against State Farm, Smith Builders, and Sonnier & Fisher Public Adjusters, LLC, on January 24, 2013. State Farm answered and, by amended answer filed on January 22, 2014, urged the affirmative defense that the suit was untimely under a provision of the insurance contract which required any suit against State Farm to be filed within one year from the date of loss or damage. The policy further provided that to conform with state law, when a policy provision was in conflict with the applicable law of the state in which the policy was issued, the law of the state will apply.
On May 2, 2014, State Farm filed a motion for summary judgment in which it argued, in part, that there was no genuine issue of material fact that the Shreves failed to comply with the policy provision requiring when suit was to be filed. In their opposition, the Shreves argued in part that the suit was not untimely because of prescription or the terms of the insurance contract: La. R.S. 22:868(C) prohibited policy provisions that purported to reduce an insured's time to file suit under a policy to a period of less than two years. At the hearing on the motion for summary judgment, State Farm's attorney argued that nonetheless the claim was not brought within 24 months. On October 23, 2014, the trial court denied the motion for summary judgment.
In 2014, the Shreves hired Foy Gadberry, a Ouachita Parish civil engineer who performs code inspections for several parishes, to evaluate their claim. He first visited their house in June or July of 2014. Gadberry believed that the crack in the foundation was caused by the tree falling on the house. His theory was that when *1180 the tree fell, its weight lowered the front of the slab and pushed the rear of the slab up.
The deposition of Hassenboehler was taken on January 15, 2015. On March 30, 2015, the Shreves filed a second supplemental and amended petition, asserting that Hassenboehler's report was insufficient to conclude that the tree did not cause the cracks. They asserted that the denial of coverage was without just cause, and they were entitled to damages, penalties and attorney fees for State Farm's breach of its duties of good faith and fair dealing as well as its affirmative duty to adjust their claims.
On June 1, 2015, the court granted the Shreves' motion to dismiss their claims against the defendants associated with Sonnier & Fisher.
When State Farm learned that Gadberry had an opinion contrary to Hassenboehler, it retained Dr. Jerry Householder, a consulting engineer and retired engineering professor from LSU.
Gadberry and Dr. Householder visited the house on March 13, 2015. Householder and Gadberry each took a soil sample from a depth of 18 inches at the same location. Gadberry took an additional soil sample from another location.
Dr. Householder and Gadberry had sieve tests run on the samples to determine how much clay and silt was in the soil. Soil analysis showed it was 17% sand and the remainder was a combination of clay and silt. Clay soil is very susceptible to shrinking and swelling because it is volatile regarding moisture content. Gadberry also had an Atterberg limits test performed to determine the plasticity index and liquid limits of the soil. The test revealed that it was a fat clay with sand.
Dr. Householder wrote to State Farm's counsel on May 31, 2015, regarding his conclusions. Dr. Householder had reviewed the petitions, Hassenboehler's report, photos, Hassenboehler's deposition, and Gadberry's affidavit and deposition. He stated that it was his understanding that Gadberry believed the tree falling on the house caused the crack in the slab in December of 2010. He agreed that if the front of the house was forced down, then the soil beneath the slab could cause some indeterminate amount of flexural stress in the slab.
Dr. Householder further noted that Gadberry opined that over time, the tension gradually weakened the slab to the point that it finally cracked at its weakest point. Dr. Householder countered that there was no engineering principle to support that theory. First, concrete does not weaken with age, but actually strengthens with age. Second, concrete does not weaken because it is under stress. Third, if the slab was being forced upward into a bow, the soil beneath the slab would have to be pushing up on the slab with a force greater than it did before the tree fell. It is well settled that clay soil such as at the site will consolidate under load. The consolidation would relieve the force and flexure in the slab.
Dr. Householder also noted that he had reviewed rainfall records for Calhoun, Louisiana, from October 2009 through December 2010. These records showed rainfall of 42.22 inches, or a 23.45-inch deficit for that period. A deficit that great would cause the water table to lower. Dr. Householder found that the cracks in the brick masonry were consistent with differential settlement, and that cracks in concrete slabs often accompany differential movement. He acknowledged that it can sound like a gunshot when concrete cracks.
Dr. Householder opined that any flexural stress in the slab due to the tree pushing the front of the foundation into the ground would have been greatest immediately *1181 after the impact and that to the extent it might have existed, the flexural stress decreased over time due to the consolidation of the clay, assuming that the clay was under stress from the slab. He concluded that there was no engineering or scientific evidence that the crack in the slab was caused by or influenced in any way by the tree falling on the front of the house. He added that drought conditions can cause differential settlement, and that differential settlement can cause slab cracks.
Ouachita Parish received 22 inches of rain in March of 2016. Gadberry went to the house once a week for four weeks during that month and took elevation readings of the slab to see if it was moving up or down. He found no appreciable difference, and he concluded that the soil was not highly volatile or highly susceptible to shrinking or swelling.
This matter proceeded to trial. A jury trial was conducted over a week in February of 2017.
Gadberry testified at trial as an expert in the field of civil engineering. He believed that the "gunshot" heard in December of 2011 was probably the sound of a rafter in the attic breaking, although it would have been associated with the slab breaking. He estimated that the foundation cracked in November or December of 2011.
Gadberry also testified that while concrete is strong in compression, it is weak in tension, and the tree caused tension in the top of the concrete. The lowering of the front of the slab caused the middle to buckle, which then put pressure on the back of the slab. The crack occurred when the foundation could no longer take the tensile stress. He acknowledged that houses typically have a thicker slab known as a grade beam along the perimeter. The grade beam is normally 12 inches wide and 20-24 inches deep, while the rest of the slab is typically only four inches thick. The concrete's compression capacity is the same throughout a house slab, but the load carrying capacity differs depending on the slab's thickness.
Gadberry recognized that when the load capacity of a concrete structure is exceeded to the point it fails, it usually fails immediately. The tree caused an impact load, which meant it caused a greater load than if it had been placed there. The load was removed when the tree was removed. If an impact load is applied with enough force to cause a failure, the higher probability is that the failure will occur when the impact load occurs.
Gadberry did not think the soil had a high enough clay content to shrink and swell to an extent that it would have caused the crack. In his opinion, the soil samples were not taken from a reliable depth because a core of 18 inches does not tell what the soil is like for the next five to six feet. He also maintained that the samples did not show what the soil was actually like under the foundation.
Utilizing rainfall data for Ouachita Parish from 1999 to 2012 that had been compiled by the University of Louisiana-Monroe, Gadberry determined that there had not been a drought from 2010 to 2012. The university is located about 18 miles from the house. Gadberry believed that if the foundation was going to crack from a drought, then it would have happened in 2005, when the lowest rainfall during that period was recorded.
Timothy Hassenboehler testified as an expert in civil engineering including causation and failure analysis of concrete structures. Formerly an engineer for the Louisiana DOTD, he performed concrete strength tests, concrete behavior tests, and soil analysis. In his opinion, the crack was *1182 caused by differential settlement influenced by drought.
Hassenboehler explained that differential settlement occurs when soil under one part of a slab goes down to a greater extent and at a faster rate than elsewhere, leading to different levels of support for the slab. Differential settlement can cause plumbing fixtures to become dislodged. While the plumbing was referenced in his report, he testified that differential settlement, and not the plumbing issue, was the primary factor involved in the crack. He noted that he found a void under the grade beam where the soil was not flush against the grade beam.
Clay soil is very susceptible to changes in moisture content. The higher the clay content in soil is, the more susceptible it is to expansion and contraction. Hassenboehler testified that settlement caused by clay shrinkage can be worse at the perimeter of a slab because that is where the soil is closer to the environment and the moisture in the soil can easily evaporate.
Although Hassenboehler did not take a soil sample, he knew North Louisiana typically has clay-type soils that are reddish in color, as he saw at the Shreves' house. He testified that he believed that he can make visual inspections of soil and get a general idea of what type of material it is. He also went to the U.S. Geological Survey website to obtain information about soil conditions.
Hassenboehler explained that just because one day from the drought monitor map was included with his report did not mean he only looked at that day. He testified that he looked at the drought monitor for Louisiana from August of 2011 through August of 2012. He insisted that he had used a drought from May 2011 through December 2011 as the basis for his opinion, although this was not mentioned in his report.
When prior drought years were pointed out to Hassenboehler, he testified that just because the slab did not crack to the extent it did in 2011 did not mean the slab was not having problems or not moving. He thought the slab could have moved significantly in 2005.
When asked about the measurements that Gadberry took during a wet month, Hassenboehler thought the half-inch movement measured by Gadberry was significant. He also explained that a large amount of rain in soil with a high concentration of clay would cause it to swell, but it would not necessarily push the slab up. He believed that if someone is going to compare the movement of a slab in anticipation of upward movement caused by wet conditions, then they also need to take measurements during a dry period for comparison.
Hassenboehler also explained that he did not base his opinion solely on the existence of the drought and the high clay content in the soil, but also considered the location of the crack and the timeframe from when the tree fell until the crack was discovered.
Hassenboehler opined that the tree could not have caused the crack because the stress from the tree falling at the front of the house would have cracked the middle of the slab, not at the rear edge. Moreover, if the tree caused the crack, the slab would have cracked immediately, not two years later. Hassenboehler added that concrete strengthens with time, and as long as a compression load is within the concrete's load capacity, the concrete will not weaken and will hold the load indefinitely.
Hassenboehler was presented with data showing that the average annual rainfall was 51.57 inches from 2006 to 2008, and 51.51 inches from 2009 to 2011. In 2011, 50 inches of rain fell, and in 2012, 62 inches.
*1183 The rainfall total in 2012 was the third highest for the period of 2003 to 2012. Nevertheless, Hassenboehler asserted that he could not say that 2012 was a drought year or a wet year without knowing what to expect for the area. He still thought there was a drought between 2009 and 2012. He asserted that he relied on the drought monitor map to provide a visual picture of whether there was drought because he was unable to determine how much of a reduction in rain over what period of time would constitute a drought.
Dr. Jerry Householder received an MS in civil engineering with a specialty in geotechnical foundations. Geotechnical engineering is the study of how soils react to loads and what happens to soil as you try to use it as a construction material. His PhD was in civil engineering with a specialty in structural engineering. Most of his career was spent as a practicing engineer. At LSU, he was the department head in construction management and a distinguished professor in the College of Engineering. Dr. Householder was accepted as an expert in the field of civil engineering, including structural and geotechnical engineering and specifically failure analysis of the Shreves' foundation.
Dr. Householder testified that the differential settlement which caused the crack was the result of the drought, movement of the water table, and expansive clays. He stated that while at first he did not think there was an expansive clay problem at the house, after he saw all the evidence, he thought it was a possible contributor.
Dr. Householder testified that his report explained why there could have been settlement, but not why the slab fractured. He does not know why the slab fractured, and it may have been fractured before the tree fell. He later explained that there is no way for him to know when the crack occurred because there was trial testimony about a crack in the master bedroom before the tree hit, there are often dry and shrinkage cracks in houses; this one has grown longer and wider.
Dr. Householder testified extensively about the water table. The water table comes up when there is not as much evaporation and tree roots are not sucking up as much water. It is generally at its deepest level in July and August. He explained that once the water table drops past its lowest previous point, then internal stresses such as consolidation begin. He asserted that there was rainfall deficit of more than 37 inches between November of 2009 and November of 2011, and this reduction would have caused a differential of 12 feet in the water table. Dr. Householder used rainfall data from Calhoun, Louisiana, which is four miles from the house.
Dr. Householder was critical of Gadberry's opinion for several reasons. First, he was unaware of any engineering principle or other authority to support Gadberry's statement that over time, tension gradually weakened the slab to the point that it finally cracked at its weakest point. Unless stress breaks concrete, it remains just as strong as it was before. Second, stress within the concrete's load capacity does not weaken it. Third, stress caused by the tree would have dissipated as it moved away from the tree. If the tree had caused a fracture, he would have expected it to be along the front of the house. Fourth, when the tree first fell, it would have put the water in the soil under a lot of pressure, but it takes time to squeeze water out of soil, so there would have been some rebound when the tree was removed. Fifth, if the load from the tree was enough to cause the slab to go down any significant amount, then the window at the front of the house would have cracked.
Dr. Householder acknowledged that it is possible that a load could push the slab *1184 down far enough that it would crack somewhere, but if that happened, it would have happened when it was under the load the first time. When the tree was removed, the load was removed as well.
State Farm was the only remaining defendant after the trial judge granted Smith Builders' motion for a directed verdict. The jury found that: (1) the crack in the foundation was caused by the tree falling on the house; (2) State Farm should compensate the Shreves in the amount of $130,600 for the damage to the foundation; and (3) State Farm was unreasonable, arbitrary, and capricious in handling the claim, entitling the Shreves to an award of $140,000 for noncontractual damages. The jury did not find that State Farm should be penalized in addition to the noncontractual damages
The parties had agreed that the trial judge would determine the date of loss for prescriptive purposes and the maximum amount of contractual damages and attorney fees. The trial judge found that the date of loss was when the Shreves heard the gunshot sound in December of 2011. The judge also found that although State Farm had insured the house for a total value of $130,600, State Farm had already paid $42,973 to repair damages caused by the tree. Because the foundation damage was part of the same claim, the maximum amount that could be awarded for contractual damages was $87,627. The court awarded attorney fees of $25,000.
On April 24, 2017, State Farm filed a motion for JNOV as to that part of the verdict finding that it had behaved in an arbitrary and capricious manner when handling the claim. In the alternative, State Farm requested that the noncontractual damages award of $140,000 be reduced by remittitur. The court granted the motion for JNOV and vacated the noncontractual damages award of $140,000 and the attorney fees award.
The Shreves appealed the judgment granting the motion for JNOV. They first contend that the trial judge erred in granting JNOV on the issue of bad faith. Next, they argue that the $140,000 damage award was within the jury's discretion and should be reinstated, or at a minimum, they should be awarded the mandatory statutory penalty. Third, they argue that the $25,000 attorney fees award should be reinstated and increased, and an additional amount award for services rendered on appeal.
State Farm filed an answer in the alternative that this court reverses the grant of the JNOV. State Farm argued that the award of $140,000 in noncontractual damages was not supported by the record.
DISCUSSION
The threshold issue in this matter is whether the trial judge erred in granting JNOV on the issue of State Farm's bad faith.
Insurers are burdened with a duty of good faith and fair dealing under La. R.S. 22:1973, which provides:
A. An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A of this Section:
*1185 (1) Misrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue.
(2) Failing to pay a settlement within thirty days after an agreement is reduced to writing.
(3) Denying coverage or attempting to settle a claim on the basis of an application which the insurer knows was altered without notice to, or knowledge or consent of, the insured.
(4) Misleading a claimant as to the applicable prescriptive period.
(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
(6) Failing to pay claims pursuant to R.S. 22:1893 when such failure is arbitrary, capricious, or without probable cause.
C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.
D. The provisions of this Section shall not be applicable to claims made under health and accident insurance policies.
.....
La. R.S. 22:1973 was renumbered from La. R.S. 22:1220 by Act 415 of 2008. La. R.S. 22:1893, referred to in (B)(6), applies to claims involving immovable property. La. R.S. 22:1893(B) states that if damage to immovable property is covered, in whole or in part, under the terms of the policy of insurance, the burden is on the insurer to establish an exclusion under the terms of the policy.
The phrase "arbitrary, capricious, or without probable cause," is synonymous with "vexatious." Reed v. State Farm Mut. Auto. Ins. Co. , 2003-0107 (La. 10/21/03), 857 So.2d 1012 ; Louisiana Maintenance Servs., Inc. v. Certain Underwriters at Lloyd's of London , 616 So.2d 1250 (La. 1993). The Louisiana Supreme Court has noted that "vexatious refusal to pay" means unjustified, without reasonable or probable cause or excuse. Id. , citing Couch on Insurance 2d, § 58:70. Both phrases describe an insurer whose willful refusal of a claim is not based on a good-faith defense. Id. Whether or not a refusal to pay is arbitrary, capricious, or without probable cause depends on the facts known to the insurer at the time of its action. Reed , supra.
Penalties and attorney fees are inappropriate when the insurer has a reasonable basis to defend the claim and was acting in good-faith reliance on that defense. Guillory v. Lee , 2009-0075 (La. 6/26/09), 16 So.3d 1104. This is especially true when there is a reasonable and legitimate question as to the extent and causation of a claim; bad faith should not be inferred from an insurer's failure to pay within the statutory time limits when such reasonable doubt exists. Id.
Both La. R.S. 22:1892(B)(1) and La. R.S. 22:1973(B)(5) and (C) provide for penalties, including attorney fees, against an insurer whose failure to pay a claim after receiving satisfactory proof of loss is found to be arbitrary, capricious, or without probable cause. Both statutes are penal in nature and must be strictly construed. Cooper v. Farmers Ins. Exch. , 50,978 (La. App. 2 Cir. 11/23/16), 210 So.3d 829 ;
*1186 Jones v. Johnson , 45,847 (La. App. 2 Cir. 12/15/10), 56 So.3d 1016. The primary difference between La. R.S. 22:1892 and 22:1973 is the time periods allowed for payment. Reed , supra.
In Davis v. Wal-Mart Stores, Inc. , 2000-0445, pp. 4-5 (La. 11/28/00), 774 So.2d 84, 89, the Louisiana Supreme Court discussed motions for judgment notwithstanding the verdict:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
The standard of review for a JNOV on appeal is a two-part inquiry. The appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the same criteria as the trial judge does in deciding whether or not to grant the motion. After determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review. Id.
The Shreves contend that State Farm failed in its duty and demonstrated bad faith by: (1) denying the claim without conducting an adequate investigation, (2) trying to defeat the claim based on a patently void policy provision, and (3) attempting to outsource its duties instead of employing those with sufficient expertise to evaluate the claim. The Shreves maintain that each time they questioned or disproved a justification by State Farm, the insurer offered a new and different justification. The Shreves argue that they offered evidence that State Farm engaged in actions that even if taken alone, were sufficient to support a finding of bad faith.
Reliance on experts
The Shreves contend that Hassenboehler's inspection was cursory and his opinion contained obvious errors: (i) Hassenboehler never tested or checked the plumbing when, in fact, the plumbing was not broken; (ii) his conclusion of drought was based on a time period that was not relevant; (iii) he based his conclusion of a drought on a USDA drought monitor map, which contained the warning that it focused on broad state conditions and that local conditions may vary; and (iv) Hassenboehler's report does not describe the soil at the house based on his personal observations, and he never took a soil sample or performed soil tests.
The Shreves assert that their claim was denied based on his report without State Farm seeking any additional information or questioning Hassenboehler's conclusions. They maintain that testimony by State Farm's representative that State Farm prohibits its insurers from questioning its independent experts may have led the jury to infer that she deliberately provided an inaccurate description of State Farm's claims procedure in order to divert the jury's attention from Hassenboehler's sloppy investigation.
*1187 Hassenboehler testified that Toby told him the toilet would bubble when the bathtub was drained, which indicated to Hassenboehler that there was a plumbing issue. Also, when he placed his hand in a gap in the soil under the foundation, he thought the soil felt damp. Toby explained at trial that the bubbling noise was from water going into the sewer line and not water coming into the bathroom, and it stopped when he cleaned the bathtub's drain. Hassenboehler testified at trial that differential settlement, and not the plumbing issue, was the primary factor involved in the crack.
Hassenboehler utilized drought monitor maps from a span of dates that he thought would give him an indication of whether or not a drought existed. The maps advised that the drought monitor focused on broad-scale conditions, and that local conditions might vary. While the U.S. drought monitor classification scheme contained a caveat that the USDA did not recommend using the map to infer specifics about local conditions, it further stated it could be used to identify likely areas of drought impacts, including water shortages. Hassenboehler thought the map was reliable to determine the general conditions of the area. He explained that whether a specific location had a little more or less rain than another area did not change the fact that in general the entire area was undergoing drought conditions.
Dr. Householder said he understood why Hassenboehler used the drought monitor map, but he did not know enough about the drought monitor map to say whether it was right or wrong.
Hassenboehler ascertained that there was clay in the soil based upon his observations. Dr. Householder explained that he could have reached basically the same conclusion that the soil had a concentration of clay without taking a soil sample, but he was glad he took the sample because it let him know exactly what kind of clay they were dealing with. Based on his experience, when he looked at the soil, Dr. Householder was able to determine from its general geological character that it was red clay, and he had no question it was red clay.
The Shreves further argue that State Farm operated under the notion that it could fulfill its duty under law by outsourcing its tasks to independent experts who worked without supervision from State Farm, and if the work of those experts was inadequate, then State Farm would not be responsible for their errors.
Paige Hutchinson was the State Farm representative who testified at trial. She testified that a manager made the decision to deny the claim after receiving Hassenboehler's report. When asked if State Farm had a policy to evaluate an expert's report, she replied that it was not her job to tell independent engineers how to do their job. They rely on the engineers to tell them what the cause is so they can see how it relates to the policy. Hutchinson took Hassenboehler's report at face value and considered it satisfactory to give State Farm the information that it needed.
It should be noted that once Hassenboehler completed his report, it was reviewed by another engineer at Donan as part of the company's peer review process.
After Gadberry's deposition was taken, State Farm's attorney retained the services of Dr. Householder. The Shreves maintain that the unusual circumstances surrounding the hiring of a second expert allowed the inference that State Farm knew after Gadberry's deposition that Hassenboehler's opinion was too poorly reasoned to be credible.
Dr. Householder testified that he was asked to give a second opinion after State *1188 Farm received a report from an engineer and Gadberry provided a conflicting opinion. State Farm wanted him to tell them which opinion was correct. While he had been appointed in the past by courts to give a report to a judge when two experts conflicted, he had never had a party ask him to give a second opinion. He did not completely agree with Hassenboehler's opinion, but added that no two engineers ever totally agree. More specifically, he did not think that the soil erosion mentioned by Hassenboehler had had any bearing on the case. Nevertheless, Dr. Householder said he agreed with Hassenboehler's statements that the drought caused the house to experience differential settlement, which caused the concrete slab to crack. However, he did not rely on Hassenboehler's opinion, but conducted his own independent analysis to determine what caused the failure.
The Shreves contend that after Dr. Householder's rainfall data was called into question, he reformulated his theory under circumstances in which the jury could reasonably conclude that he attempted to create a sham defense. They note that in his letter to State Farm, Dr. Householder looked at rainfall records from October 2009 to December 2010 to support his conclusion even though the "gunshot" sound was heard in December 2011. They further note that Dr. Householder testified at trial that in order to determine if there was a drought sufficient to crack the foundation, he needed to look at two years of rainfall records. To support his drought theory, Dr. Householder then used records from November 2009 to November 2011, which actually covered 25 months.
Dr. Householder is also accused of cherry-picking the months he considered in order to create the appearance of a drought. The Shreves contend it would have been more appropriate if he had considered the 24 months preceding the date of the gunshot sound; instead, Dr. Householder unnecessarily included November and December of 2009, which happened to be unusually dry months, in his analysis. December of 2011, which was a wet month as well as the month of the gunshot sound, was excluded.
The Shreves also allege that Dr. Householder was impeached on cross-examination when he was dismissive of an excerpt from a textbook written by Dr. Karl Terzaghi, a Russian engineer considered to be the father of soil mechanics. A different excerpt from Dr. Terzaghi had been included in Dr. Householder's report. Without being told the source of the excerpt, Dr. Householder was asked what he thought of it. He replied that the excerpt sounded like it had been written by a geologist.
The Shreves maintain that the jury could have concluded that Dr. Householder was a deliberately dishonest witness who misrepresented rainfall data and principles of engineering in order to supply justification for State Farm's decision to deny the claim.
While Dr. Householder stated in his letter that the only rainfall he looked at was October 2009 to December 2010, he added the following year when he realized that he had left it out. It was when he used the two-year period that he came up with a deficit of 37 inches.
After Dr. Householder's deposition was taken, he decided to look at rainfall data all the way back to when the house was built. In fact, he was asked at his deposition if he would consider looking at the rainfall data for additional years; his original opinion was confirmed after doing so.
The excerpt that Dr. Householder was unaware belonged to Dr. Terzaghi was that the first step in any subsoil exploration *1189 should always be an investigation of the general geological character of the site. The second step was that it is obligatory to drill holes that furnish more specific info regarding the general character and thickness of the individual strata.
Dr. Householder explained that the geology of the soil does not help him in trying to figure out how to prepare a foundation program or determine what is wrong with something. Geology is the study of how different kinds of rocks and soils were formed. He added that engineers typically do not care about geology, and he wants to know a soil's consolidation, shear strength, and plasticity index to come up with a program to design a foundation. He also disagreed that it is obligatory to drill holes that furnish more specific information regarding the general character and thickness of the individual strata. He believed that what is obligatory is to find out what is in the soil, not when it was formed.
Once it was revealed that the excerpt was from Terzaghi's textbook, Dr. Householder further explained that he knew the general geological character of the site was red clay, and the excerpt did not say how deep the exploratory drill holes were to be. Dr. Householder explained that except for the part about understanding the geological process there, the excerpt from Dr. Terzaghi's textbook is a program that he has followed when building. He added that he knew the difference between the geology of sand and clay. Dr. Householder also stated that it is a program that would be outlined for planning a major project, but what he was trying to do in this case was simply to establish that the soil is clay. He insisted that he did not mean that the excerpt was written by a geologist, but rather that it sounded like a geologist talking. Dr. Householder asserted that he did not violate any of Terzaghi's principles in his analysis.
Dr. Householder was also asked about an excerpt from Terzaghi's textbook concerning water tables that he reproduced in his letter to State Farm. From the Shreves' perspective, the excerpt was incomplete. Dr. Householder explained that he intentionally omitted the part about lowering the water table for a large, open excavation because it was irrelevant and had nothing to do with this matter as there was not an excavation at the Shreves' site.
It is important to keep a timeline in mind when considering whether the JNOV was properly granted. The tree fell in 2009. It was over two years later that the slab damage allegedly caused by the tree first manifested itself with the gunshot sound. The Shreves did not discover the crack until almost three years after the tree fell. Once a claim was made, State Farm dispatched an engineer to evaluate the cause of the crack within two weeks. The engineer's report, which was peer-reviewed by another engineer, concluded that differential settlement caused the crack. That was in 2012. In 2014, the Shreves retained an engineer who supported their claim that the tree was the cause. Faced with conflicting opinions, State Farm opted to reach out to another engineer. In light of these circumstances, State Farm had a reasonable basis to initially deny the claim and continue to deny it through trial. They relied on this defense in good faith.
Timeliness of the claim
The Shreves next contend that State Farm's strategy in defending its claim was to rely on the timeliness issue because State Farm could not seriously argue that anyone in its employ adequately investigated the facts or the law. They note that State Farm moved for summary judgment on the ground that the policy contained a provision requiring suit within *1190 one year, even though state law had provided since 2007 that a policy provision giving a homeowner less than two years to file suit was void.
Before trial, State Farm maintained that the policy contained a savings clause reforming the provision to comply with Louisiana law. The Shreves assert that State Farm's position was that any claim was untimely because the tree fell in 2009, suit was not filed until 2013, and contra non valentem did not apply. They contend this argument was based on an unreasonable interpretation of the policy and governing legal principles.
The trial judge concluded the timeliness issue was to be decided by him and not the jury. During State Farm's examination of Hutchinson, she was asked about the policy provisions regarding when suit must be filed. The Shreves contend that after the jury's attention was directed to this provision, the jury was not explicitly told that it was void or that contra non valentem could apply. The Shreves contend this presented an extremely high risk of jury confusion, especially since the jury would not receive instructions about the law governing timeliness. During cross-examination, Hutchinson admitted that the provision violated state law.
Misleading a claimant as to the applicable prescriptive period is listed as one of the acts in La. R.S. 22:1973 that, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duty of good faith and fair dealing.
State Farm did not lull the Shreves into a false sense of security by misleading them about the time in which they had to file suit. No time period was even mentioned in the claim denial letter. Moreover, although counsel for State Farm premised its motion for summary judgment on a void policy provision, the Shreves' counsel quickly pointed out in his opposition memorandum that State Farm could not reduce the Shreves' time to file suit to a period of less than two years.
Any jury confusion that was created by questions asked of Hutchinson by State Farm's counsel concerning the time to file suit was cleared up by the Shreves' counsel, who further explored the issue on cross-examination. Hutchinson insisted that State Farm neither denied the claim on the basis that it was considered untimely nor used Hassenboehler's report as a ploy to deny the claim instead of stating it was too late for them to file suit.
In light of the timetable presented earlier, we cannot find reversible error as to State Farm on this issue.
Testimony from the Hancocks
The Shreves contend that after State Farm's evidence of a drought was repudiated, State Farm relied on testimony from the Hancocks, a family of carpenters who worked on the house, that the Shreves told them that a crack in the foundation at the back of the house had existed since they purchased the house. The Hancocks said they relayed this information to the contractor, Charles Smith. Smith never mentioned this at trial.
When Smith went to house in October of 2009, he saw the crack in the brick veneer wall along the west side of the house. It was the only crack on an outside wall that he saw. Toby Shreve acknowledged to Smith that the crack was there before the tree had fallen.
James Hancock worked on the Shreves' house for Smith Builders along with his wife and son. He recalled that the Shreves asked him if the crack in the brick veneer on the west side of the house had been caused by the tree. He noted that the crack contained cobwebs as well as caulking indicating it had been repaired. James claimed that Sherri told him that there *1191 were cracks in the slab under the master bedroom that had been there when she purchased the house.
Glenda Hancock testified that the Shreves told them there was a crack in the concrete floor in their bedroom running underneath their bed. She could not see the crack at the time because of the flooring. Nicky Hancock testified that there was discussion when Toby was present that the crack in the brick veneer was the sign of a foundation issue.
It was appropriate for State Farm to present this testimony as it shed light on the Shreves' credibility. Again, it must be kept in mind that the Shreves were seeking coverage for damages that manifested themselves at least two years after the event that allegedly caused them. In addition, Hassenboehler had observed cracks, some of which had been repaired and some of which had not, in the brick veneer and slab on the west side of the house.
Credibility
Finally, the Shreves aver that the trial judge not only stated that he found State Farm's experts to be credible, but also that he believed defense counsel's explanation for why Dr. Householder was retained. A trial judge cannot evaluate the credibility of witnesses on a motion for JNOV.
The trial judge did comment that he found the witnesses to be credible. However, that comment needs to be placed in context. What the trial judge said was:
They have a legitimate right to defend these claims. And candidly, I'm not going to evaluate the credibility of the witnesses. I can't do that. I listened to all the evidence as did the jury. And at the conclusion of the evidence, when the jury was deliberating, I found that the case could have gone either way. The jury certainly had a-I'm talking about on the issue of causation at this point. The jury had sufficient evidence to hang its hat on what it did in terms of finding State Farm liable under the policy for causation. But I think there was just as much evidence to go the other way, for State Farm to have prevailed because of their experts and their testimony. Yes, I do believe that State Farm has an obligation to evaluate the findings of their experts, but they do have to give some deference to them. And I found them to be credible. They seemed to be just as credible as Mr. Gadberry was. However, the jury found-chose to believe Mr. Gadberry, which they had every right to do. The Court's inquiry has to go deeper than that....
Thus, it is clear that the trial judge was not considering the credibility of the witnesses when determining whether or not to grant the motion for JNOV.
Finally, although the trial judge stated that he believed State Farm's counsel that Dr. Householder was retained either to support Gadberry's theory or to refute Hassenboehler's theory, any error was harmless. There was abundant evidence in the record that State Farm had Dr. Householder provide an independent analysis because Gadberry and Hassenboehler had presented conflicting opinions.
In conclusion, the trial judge did not err in determining that reasonable persons could not have found that State Farm acted in bad faith and unfairly dealt with the Shreves when handling their claim, or that State Farm denied the Shreves' claim in an arbitrary and capricious manner or without probable cause. The JNOV was properly granted.
DECREE
At the Shreves' cost, the judgment granting the motion for JNOV and vacating *1192 the awards of noncontractual damages and attorney fees is AFFIRMED.